Counsel for appellant please approach and proceed. Mr. Martin, can you hear us? Yes, your honor. Thank you. Thank you, your honor. May it please the court. Paul Hoffman for the plaintiffs and appellants. I'd like to reserve three minutes for... Counsel, please be reminded that the time shown on the clock is your total time remaining. I understand. Thank you. With the court's permission, I'd like to start with the as applied issue in the case since it's one that the district court really didn't deal with and this court didn't reach in the first time in the first case. The question is does the eighth amendment excessive fines clause require some consideration of ability to pay in the analysis? Not something that's been decided by this court or by the supreme court. Our position is that the analysis that's laid out in the city of Seattle versus long case is the appropriate analysis for we would hope this court would accept as a requirement under the eighth amendment. And it goes back as the city of Seattle case shows in a very detailed history of the eighth amendment that this requirement goes back really to the Magna Carta, which is what the eighth amendment was basically taken from almost verbatim, although over 800 years it was accepted in the English Bill of Rights, the Virginia Bill of Rights, and now accepted in 50 states. Yes, but counsel, there is no case specifically that says in determining a case under the excessive fines clause, we have to consider the ability to pay. There is no case that says that. Well, there's no case. The supreme court hasn't decided the issue. This court hasn't decided either way. It hasn't decided whether it has or it hasn't. And the reason I refer to city of Seattle versus long is that that's a case that took on this issue in the first instance, laid out the history that shows that it should be a requirement because the Magna Carta talks about the proportion of the fine or the penalty to the wrong, but it also talks about whether it has an impact on someone's livelihood. And so it was both parts of that were part of the excessive fines idea that came into our constitution with the founders. Yeah, I'm sorry. I just want this question, but that's a state court case. Sure. No, it would be asking us to adopt that. We don't have any precedent, any binding precedent for that from Supreme Court or from our circuit or from any other circuit. So that would be the basis for it. I'm just, I'm just clarifying. This is a case of first impression. And it's a case of first impression for this court. It hasn't been decided expressly by the Supreme Court, which said it wasn't deciding. So, so in a, in a case where somebody has the money to have a car, has the money to get the required insurance for the car, has the money or gas getting around in the car, we should say to all municipalities that before you can impose, for example, a $69 parking fee or a $20 parking fee, you have to take into account the ability to pay of everybody who's driving the car and, and parking on, if it's New York sixth Avenue or the equivalent in Los Angeles to decide if they can pay before, before you can, before you can impose it. No, I don't think that that's the, the only way that a municipality can deal with it. The municipality could deal with it by having a person of low income would be such that it would trigger eighth amendment considerations that they could have a program where that person could, could pay over time, could pay less. In fact, the city has made some steps towards that after this case. In your view, there's a constitutional requirement vis-a-vis parking tickets that the city has to take into account. It can't have like 20 bucks for everybody. It has to have a system in place to take into account the claims of people who say, yes, I can drive the car, but 20 bucks is grossly disproportionate because paying the 20 bucks for my overstaying my parking is going to impact my ability to get and keep a job. Well, 20 bucks, man, I'd do that, but $300 might do it. $126. But your, your point is that it has to be taken into account in parking fines and parking late fees in general. Well, I, I think the eighth amendment, yeah, it has to be taken into account by, by parking authorities in every city in the United States. Okay. If we don't accept your argument, if we decide that we are not going to follow the Washington state case, what's your next argument? Well, okay. If you don't accept that ability to pay should be factored into an eighth amendment analysis, as the Washington Supreme Court has said. The facial challenge also, we believe on the late payment penalty should be struck down as a violation of the eighth amendment. And the, our, we've laid this out in our briefs, of course, when one point, and again, I, the court may not be persuaded by the Washington Supreme Court, but one of the things the Washington Supreme Court also said was that one of the other things the eighth amendment was designed to do was to prevent government from using fines and penalties, basically for general revenue purposes. And that's just, oh, sorry, if I interrupt, suppose the late fee here is say only $10 and the evidence shows the city is using it just for revenue purposes. Would that still be, would that still violate the eighth amendment? I think that's a close question in the sense that it's, it's, it's clear that a late penalty fee has some relationship to the loss of money for a period of time. So a $10 fee, given the discretion that's afforded to municipalities under the eighth amendment jurisprudence under by Jackie and, and this court's opinion, I doubt there'd be much of a challenge to that, but we're not talking about a $10 fee here. We're talking about a hundred percent penalty. If you don't pay on the 22nd day, you, you had said, I think below, and I'm looking at SCR one Oh four, the initial penalty should be no more than $25. Well, the expert, Mr. Bieber made a statement like that. Yes. Okay. So, but, but from your answer to judge Lee's question, there's some number here where you would say, no, it's on its face. Fine. There's, there's, there's some number where you would say on its face, grossly disproportional and everything else goes to a jury. Well, I think the, the, the first question from our standpoint, at least is for the court to engage in the analysis that's required under by Jackie and right. So four factor tests and other factors that might be relevant. You need to know something about the offense, obviously, and a parking staying over a parking meter is about as minimal as fence as anyone could have hundreds of thousands of Angelenos have that problem every year. And 85% of them are first-time offenders. The big issue, right. And the fight in this case has been about whether the late a hundred percent late payment fee after 21 days has some relationship to harm that the city is claiming part of your argument is if you don't win as a matter of law, it should go to a jury to decide whether $69 is too much. And if, for example, your jury decided everything over $49 was too much, then in your class action certification, you would be seeking to get $20 back for everybody who paid a late fee plus attorney's fees. Well, I mean, if there's a violation on the face, then yeah, I mean, if the court granted class certification, then that's what we would be asking for. But I think in terms of the facial challenge and the analysis of it, our main point is that the city hasn't come forth with any evidence or facts about justifying a hundred percent late penalty fee after 21 days. Just suppose the city produced a witness who says the $63 late fee is to ensure compliance. And we came up with that figure. We didn't do a big study, but we looked at some data, you know, or we thought, you know, $5 probably won't ensure compliance. 63, the modest amount we thought that would ensure compliance with paying the parking fine. Would the city prevail then? I think if the city came up with a rationale that said, look, here's the process that we engaged in. We think that this is something that will ensure compliance. You know, under our theory, they should also take into account ability to pay given the fact that so many people that get these problems for our community because of that. But sure, if they came and they went through that process, I think they would get a great deal of deference. On the other hand, they don't get absolute deference. In other words, say they went through that process and they said, you know, 300% of the initial fine after 14 days, that'll really get people to pay. Well, at some point, it's excessive, right? And you have to go through the balance. You have to have the information to go through the balance. The Eighth Amendment would be a toothless amendment if all they have to do is say, well, you know, we came up with this number. We're not going to tell you how we came up with it, but 100% is probably going to make people pay. But doesn't the toothlessness type analysis sort of depend on what you're starting with? That if you were starting with a fine of a million dollars, I mean, to channel Justice Stewart's words, I might not be able to come up with the exact rationale, but I know grossly disproportionate when I see it. And somebody could say for the million dollars, yeah, I know it when I see it. But $63 for a parking fine, I also know it when I see it, and this doesn't make it. Well, I mean, that goes to the function of a judge in a jury context too, right? If there is a jury entitlement, yeah. Could a reasonable jury decide that when you look at the factors and the evidence that this is an excessive fine? Our position from the standpoint of why summary judgment shouldn't be granted and why it is an appropriate jury decision is that we have evidence that number one, the late penalty fee is a completely arbitrary number that they just double whatever the fine is without regard to any rationale for doing it. And that the main reason they do it is to make money, the revenue. And that again goes back to the history of the Eighth Amendment. I mean, the excessive fines clause was in part because King John on through the Stewart's and the Tudors used fines to make money, to wage war, to build castles. Now what's happening on this, our position is what they've done is this late penalty fee is just an add on to the general revenue of the city of Los Angeles to balance their books, not to deal with the harms that have to do with overstaying a meter for a minute. Council, do you know what the maximum parking fine is? The maximum parking fine? Well, I think it's 63 plus 63 plus 25. In your case, but is there a scenario where the fine could be higher? You know, I think it depends. It has to bear some relationship to the offense, but I'm asking you the question. Do you know what the maximum parking fine is in the city of Los Angeles? The most that can be charged to someone for overstaying their parking time? Do you know? It's 63, 63, 25, 25. I just thought that was. I think it's 181 if I get the math right. You don't understand the question I'm asking. Is $63 the maximum amount? We're not talking about adding on anything. What's the maximum amount? It's a $63. Oh, okay. So that's the most that someone can be charged for parking. So the most someone can be charged in the city of Los Angeles, regardless of how long they park over time is $63. Is that? That's the first violation. Fine. Yeah. Okay. Yeah, I'm sorry. I see. I want to reserve some time. We'll hear from the city. Council. Morning, Your Honors. May it please the court. Timothy Martin for LA City of Los Angeles. The court should affirm the summary judgment for the city for much the same reasons that it affirmed summary judgment in Pimentel 1. Just like the $63 parking meter fine, the $63 late payment penalty is not so large, and it likely deters violations. While the initial fine directly deters parking meter violations, the penalty indirectly deters them by giving the offender a reason to pay the fine. The fine would be ineffective as a deterrent if scofflaws could ignore the parking citation and withhold payment indefinitely without receiving any penalty. But Council, is there anything in the record that supports the fact that doubling the fine is the only way to have deterrence? What's the record about that? And why is it double the fine as opposed to some percentage of the fine? There's no direct evidence in the record as to why the City Council adopted a 100% relationship between the penalty and the fine as early as 2002 and maintained that 100% relationship over the ensuing decade when the City Council enacted seven increases at increments of $5 or $3. But it would be prohibitive burden on the City to have to track down all the various City Council members who voted on those enactments over time. Well, ideally the record would contain the reasoning for it. Correct, but there's no burden on the City to produce a justification for the relation between the penalty and the fine. Well, there has to be some indication that the fine is not excessive. I mean, we have to look at whether it's excessive and one of the reasons, ways we look at that is to determine how the fine was determined. But the linchpin of the excessiveness analysis is that in the Excessive Fines Clause purpose is to people from oppressive fines. And the oppressive effect of a fine is determined by its magnitude in dollars, not by its relation in percentages to some other fine or penalty. That relationship is not one of the logicology and factors and plaintiffs haven't cited any case that has looked at that kind of relationship to determine excessiveness. Council, if I may interrupt, suppose hypothetical evidence shows that the City analyzed late fees and it turns out $25 late fee is sufficient to ensure compliance, but they set it for $63 because they say, well, we need an additional $38 because that's going to help us increase our salaries in our department. Would that be excessive under the Eighth Amendment? Well, no, Your Honor, because there's no narrow tailoring requirements. So just even if the City had determined that $25 was sufficient. If they say the reason why we're packing on this additional money is just so we can increase our salaries, that would be okay just as a matter of law, it's not excessive. Potentially a portion of it could be unconstitutional if there was direct evidence from City Council members that that was specifically their reason for doing so. But there was no evidence of that matter in this record. I mean, I guess there's no evidence, at least before us, one way or the other, what the reason was of the 100% late fee. I mean, I don't think it's a high burden. I think in Pimentel 1, we said it's not a high burden, we deferred to legislatures. And if someone in the City said, we think this was a good amount, common sense, etc., looking back at our compliance data, X number of people don't pay in time, probably defer to you. But here the question is, seems like there's no evidence offered by the City at all of what the basis was. Well, in Pimentel 1, this Court didn't demand any sort of direct evidence as to the basis of $63 amount, even though plaintiffs' experts, Jay Bieber and Jace Carsman, said everything that they said about the late payment penalty, about the initial fine as well. They said that it was neither intended to nor effectual in deterring parking meter violations, and instead intended solely to generate revenue. But I think the City produced some evidence saying this was to ensure that we don't clog traffic, that people move out of parking space. I mean, you know, I think there was, again, I don't think it's a demanding requirement, but at least there was some evidence. And here, at least in the record before, it seems like there's none. Well, there is the testimony of Robert Andelon that the City adopted its two-tiered late payment penalty scheme because it believed that the similar penalty scheme used by the DMV was effective in deterring violations. And that Andelon successfully recommended an increase in the amount of the second penalty to strengthen its effectiveness as a deterrent. But he didn't, on the first late fee, he didn't know the basis at all, right? That's correct, but he said that because it was adopted before he arrived at the relevant parking. But he was a 30b6 witness. It doesn't have to be personal knowledge. He just has to do a little investigation as a 30b6 witness. That is true, but it would actually be, you know, more than a little investigation to track down every City Council member who had voted on those increases or set those amounts. You just need a little bit of evidence. And we're not talking about 50 years ago, we're talking a couple years ago, 10 years ago. That's part of preparing a 30b6 witness. The 30b6 witness is representing the entity. And again, he or she doesn't need personal knowledge. He or she just needs to do a little bit of due diligence. Well, the plaintiffs didn't bring a motion to, you know, redepose a 30b6 witness or anything like that in terms of inadequate preparation. And ultimately, they bear the responsibility. Council, aren't you also relying on the district court's finding, quoting us in Pimentel 1, that where the district court said, in light of the monetary and non-monetary harms and without material evidence provided by the plaintiffs, to the contrary, the court must afford substantial deference to the authority that necessarily lies with the plaintiffs. Given that substantial deference that is due to the legislative decisions, there's no affirmative burden on the City to produce direct evidence as to what the City Council members were considering when they set the amount of the late payment penalty. No, that wasn't for the late payment penalty. That was just for the fine, the original fine. And in Pimentel 1, we expressly said that the district court should have applied the to the late fee part of it. So, that language did not address the late fee portion of it, the late penalty. So, if we applied those factors, how would we come out on this case in your view? Could you discuss each one of those factors and tell us why it favors the penalty, why each one of those factors favors imposition of the penalty? Yes. Well, in the City's view, the fourth Baja Cajun factor, which refers to the harm of the offense or the harm that the penalty protects the City from, is dispositive because as the district court correctly found, the penalty protects the City from both substantial non-monetary harm to its interest in parking, as well as substantial monetary harm in the aggregate in the form of the further collection costs it spares by encouraging people to pay the fine timely. So, the extent of the harm, you think the extent of the harm caused by the offense carries the day against all of the other factors? I wouldn't phrase it as against the other factors because none of the other factors weighs in favor of the plaintiffs either. The nature and extent of the underlying offense doesn't weigh in favor of the plaintiffs in this case? No, Your Honor. Conceituously, the culpability of failing to timely pay within 21 days or in some circumstances longer is low, but the culpability was low as well in Pimotel 1 for violating a parking meter violation. But we're not talking about just the ticket, the parking fine, we're talking about the penalty. So, that was what Pimotel 1 said we should apply, that the district court should apply to determine the penalty and the nature and extent of the underlying offense in this case is about as innocuous as it can be, isn't it? Yes, but as Pimotel 1 pointed out with reference to the Towers case in the Seventh Circuit that at least a minimal degree of culpability, that's sufficient to trigger the deference that is due to the legislative branch in setting the amounts of fines and penalties. Not penalties. Pimotel 1 didn't talk about the penalties. That's the difficulty I'm having with your argument. Espresso said that fines, the excessive clause, the Eighth Amendment did not prevent the imposition of the fine. But as for the penalty part of it, we need to apply the Bojackesian factors. Well, correct. But, I mean, the court also applied the Bojackesian factors to the initial fine in Pimotel 1. And when I remanded the district court for a separate application of those factors, it didn't say that the record was materially different with respect to the penalty. But that's what we're here for now, though, to determine whether or not that determination is correct as a matter of law. Yes, and my position isn't that the late payment penalty is identical to the fine, or that the underlying violation is identical. Just that the instruction from Pimotel 1 and also the Towers case in which the underlying offense was simply lending one's car to somebody without asking hard questions about whether they were intending to use it to trade in weapons or drugs. Even such benign offenses are sufficiently culpable to at least not weigh in favor of the plaintiffs. What is there that we have to defer to in terms of the amount of the penalty? Why should we defer to a penalty that was set without any explanation? Well, partly because, to borrow a word from Judge Bennett's concurring opinion of Pimotel 1, parking fines and penalties are routine. They're not the kind of hot-button issue that is likely to generate a lot of legislative discussion or documentation as to the reasons for setting the amount. There's also quite a few different parking violations of different natures. So, and then the record shows that in this case the City Council set the amount of this particular penalty and the underlying fine for parking meter violations at the same time that it set the amounts for all the other parking meters. And it would be difficult for the City Council to have engaged in sort of individualized discussion or documentation of its reasons for each one. Why would that be difficult? Why would that be difficult for them to, they could have a consent agenda where it's all laid out in terms of what the recommendation, because they don't do this in a vacuum. They have staff members who work up the reasoning for the legislation, and then the legislators adopt it or not. And so, oftentimes there are consent agendas where all of this is laid out and then the legislators vote on it. So, it's not like they would have to discuss specifically each and every item that's on the agenda. Correct. But in terms of setting the specific amounts, it would be difficult for them to sort of quantify this amount for this violation is appropriate, but then a slightly higher or lesser amount would be appropriate for a different violation. And it's important to recognize, of course, in terms of why they're entitled to deference. We were talking about very small differences in degree. Mr. Hoffman mentioned that Jay Bieber said $25 would be acceptable, but in fact, Mr. Bieber said that even $39 would be constitutionally permissible. He said it would not be grossly disproportionate unless it was $40 or more. So, that is a very small difference from the $63 that we have now. And as a note, sorry, what was the question? Any evidence in the record regarding the collection costs? I think that was part of the justification for the harm that would be caused. Is there anything in the record regarding the collection costs? Because I thought the record reflected that there was a contractor who collected the costs for the city, who did collection for the city. The city refers an individual case to a contractor if the second late penalty is not paid. And there is a collection fee that is charged that is payable to the contractor. It doesn't reimburse the city for its own collection costs. Those costs would at least consist of mailing out notices of the second late penalty and communicating with the offender and the collection agency about their- As I understand it, though, the collection agency is not in play vis-a-vis the first $63 fee, right? That is correct. Right. But for the second one, that's where the collection agency comes into play. And so, the cost to the city would be what for the second, for the penalty part? The collection cost would be what? The cost of preparing and mailing out the notice to the offender of the imposition of that penalty, which Plaintiff Immantel declared that he did receive that notice, as well as a notice of the referral to the collection agency later. And Plaintiff's expert Jay Bieber recognized that there are costs to the city in mailing out notices. He characterized those costs as minimal, but the city acknowledges that its costs are small, its monetary costs are small. In any individual case in which an offender doesn't timely pay the fines and the penalties, the relevant costs from a constitutional standpoint are the aggregate costs that the penalty spares the city in the many other cases in which it induces the people to timely pay. All right. Thank you, counsel. You've exceeded your time. We helped you. Are there any other questions? No. All right. Thank you. Rebuttal? Thank you. Thank you, Your Honor. I'll be brief. I think the point is, and I think the city's conceded, there is no evidence justifying the 100% fee. It was an arbitrary fee. They just doubled the original fine. And it has nothing to do with the cost of collection. It has nothing to do with the underlying harms that the first fine were designed for. And we have lots of evidence in the record that it was designed to bring more money into the general fund. We presume that the government late fee penalty is proportional. A lot of times we do that. When the reason seems obvious, a lot of times we presume the government's rationale is legitimate. Should we do that here? Well, I think the court did that to some degree in the first round on the original fine, because there has to be some fine for staying over a meter. I don't think that applies for a 100% penalty for not paying the original fine in 22 days. I mean, that's a different kind of offense. And if you're going through the factors, you need some understanding about the nature of the harm and why the city did it, and how they came up with the money, and are they doing it just to put more money in their coffers? As Justice Scalia said in Harmelin, when the government is benefiting from the fine, you should take a much more critical look. Now, I understand that there's deference to be given in the Eighth Amendment, but that doesn't mean that the court abdicates its responsibility to insist that they come up with some evidence-based justification, even if it's a general one. And here, they have just come up with nothing to support this, other than, we doubled it. And I think that's what the evidence in the case shows. Counsel, do you take issue with the way the district court applied the Bozsikagian factors? Yes. I mean, I think what the... district court did is defer. The city said, this is why it would help our overall parking system without any evidence of any of that. And I guess he understood his role as deferring to that. And our position is that an Eighth Amendment analysis for it, even with deference to the government, should require the government to say why it did it with some evidence of why it did it, even if it's not an exact proportion, because that's not the requirement. But I think you want to have that analysis in part to prevent the government from doing something like this, to raise revenue on the backs, really, of a lot of low-income Angelenos. Because this has a terrible impact on the community. It's not trivial. That they could avoid by not overstaying their parking. Well, but, you know, I parked in the city for 50 years, right? You sometimes overstay. But, counsel, you're talking about a big picture where somebody, this is affecting, in your view, somebody's life, the $63 and the extra $63. But ultimately, whether they have to overstay or they can send the money in in time. So the key to escaping that tragedy that you're talking about is in their pocket in both instances. Well, a late penalty fee, maybe not. What if that person is living on $1,000 a month and they have to pay their rent and they have to get food and they have to get... No, but they could have put in the original thing on time. Well, maybe they couldn't afford the original $63. We already dealt with that. I understand that. And I'm not challenging that. I'm just saying that for a lot of low-income people that are affected by this, this is a big deal. That's the main point I'm making. And I think from the standpoint of excessive fines analysis, the fact that there was an offense is a given, right? I mean, factor one is there is an offense. But what I'm saying is that overstaying a parking meter for the hundreds of thousands of people in this community that do it every year is a pretty minor thing. It was decriminalized in 1992 for that reason. And it's not something that's a big deal from that standpoint. And on the harm part, the city could come up with a rationale for it. They could say, well, here's what it costs. I think you heard council say the cost is sending out a notice. What does that cost the city? It doesn't cost them $63. And there's plenty of other enforcement mechanisms, right? They can boot your car. They can take away your DMV registration. There's a whole other series of things. What we're focused on is why double a $63 penalty if you don't pay in 22 days, other than to line the pocket, to balance the budget of the city of Los Angeles. The district court said that doesn't necessarily render the fine excessive, even if part of the Go back to the Magna Carta. Go back to the tutors and the steward kings. That's why we have it, right? We don't want our monarchs or our leaders to use fines to raise revenue. It's perfectly appropriate for them to have some discretion to deal with the things that are appropriate to deal with in the Bojackian analysis. But it's not for them to just say, we'll double it. And it's going to bring in a bunch of million dollars to our budget. I mean, we have evidence in the record from the controller in 2017, where they were talking about reducing the fines for the very reasons that we're talking about in terms of impact on low-income people. And what did the controller say? Don't do it. We rely on these fines for revenue. Don't reduce the fines, even though you could, and maybe that would be better for our community. The city council, the controller says, don't do that, because it takes away our money. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court and we are adjourned. All right.
judges: RAWLINSON, BENNETT, LEE